## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY M. EVANS,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-632

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Mary M. Evans brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying her application for supplemental security income ("SSI"). This matter

is before the Court on plaintiff's statement of errors (Doc. 11), the Commissioner's response in

opposition (Doc. 14), and plaintiff's reply (Doc. 15).

## I. Procedural Background

Plaintiff filed her application for SSI in December 2014 alleging disability since

September 18, 2014, due to back pain with surgery, depression, Post Traumatic Stress Disorder,

anxiety, spinal cord stimulator implantation, broken right foot, bariatric bypass surgery, bipolar

disorder, panic attacks, and Attention Deficit Disorder. The application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was afforded a hearing before

administrative law judge ("ALJ") Deborah F. Sanders on June 27, 2017. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing. On February 28, 2018, the

ALJ issued a decision denying plaintiff's application. Plaintiff's request for review by the

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since December 30, 2014, the application date (20 CFR 416.971 *et seq*).
>
> 2. The [plaintiff] has the following severe impairments: posttraumatic stress disorder (PTSD), bipolar, generalized anxiety disorder, attention deficit hyperactivity disorder, cocaine dependence, degenerative disc disease of the lumbar spine, morbid obesity, history of chronic left trigger thumb status post release procedure, coronary artery disease, hypertension, asthma, gastro esophageal reflux disease (GERD), irritable bowel syndrome (IBS), depression, [and] cervical radiculopathy (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, [the ALJ] find[s] that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except be able to lift and carry up to 20 pounds occasionally and 10 pounds frequently, occasional push/pull with right upper extremity, stand and/or walk up to 4 hours in 8 hour day with an option to sit after every 30 minutes of standing; sit up to 6 hours in 8 hour day, option to stand after 30-45 minutes of

sitting while remaining on task; occasional foot controls but not on a continuous basis; would be able to frequently use hand controls; frequently climb ramp and stairs; never climb ladders, ropes, or scaffolds; frequent balance; occasional stoop, kneel, crouch; never crawl; occasionally engage in overhead reaching; frequent gross and fine manipulation; never work at unprotected heights, around moving mechanical parts, and never operate a motor vehicle; would be able to carry out simple routine repetitive tasks but not at production rate pace; occasional interaction with coworkers and supervisors, but no direct interaction with the public.

5. The [plaintiff] has no past relevant work (20 CFR 416.965).

6. The [plaintiff] was born [in] …1970 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the [plaintiff] does not have past relevant work (20 CFR 416.968).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[1]

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since December 30, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-30).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of light, unskilled occupations such as mail clerk (96,500 jobs nationally); office helper (180,000 jobs nationally); and routing clerk (674,000 jobs nationally). (Tr. 30, 85).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.    Medical Evidence

A July 2014 CT scan of plaintiff's lumbar spine revealed moderate to severe degenerative disc disease at L5-S1 with endplate remodeling and broad-based disc bulges with central/left disc herniation resulting in central canal stenosis and bilateral neural foraminal narrowing. (Tr. 644-45).

Plaintiff saw her primary care physician, Dr. Kathryn Lorenz, M.D., in September 2014, following an emergency room visit stemming from a foot fracture which occurred in April 2014. Plaintiff's foot was treated with a fracture boot and crutches. (Tr. 604). Plaintiff was referred to a podiatrist, and Dr. Lorenz completed disability forms recommending that plaintiff not return to work for eight weeks. (Tr. 602).

Plaintiff followed up with her treating neurosurgeon, Dr. Hugh Moncrief, M.D., in October 2014.[2] At that time, she complained of lower back pain with some radiation into her legs. She reported that loading the dishwasher increased her pain, as did prolonged standing or sitting. (Tr. 532). Plaintiff underwent an MRI for her lumbar spine, which showed mild degenerative changes. (Tr. 536-37). Dr. Moncrief recommended a spinal cord stimulator, noting he did not have a surgical solution for her. (Tr. 537). The stimulator was implanted in November 2014. (Tr. 504-12).

Plaintiff began treating with podiatrist Dr. Laurie Nielsen-Haak, D.P.M., in November 2014 for her fractured right foot. (Tr. 653). Dr. Nielsen-Haak recommended a bone stimulator for her foot. (Tr. 658). Plaintiff was given the bone stimulator in December 2014. (Tr. 667). By January 2015, plaintiff had stopped using the bone stimulator and was not wearing her CAM boot. Dr. Nielsen-Haak noted that plaintiff was not limping when she went to the x-ray room. (Tr. 669). X-rays taken in January showed good healing of the fracture. (Tr. 671). Dr. Nielsen-Haak recommended that plaintiff continue to use the bone stimulator, but plaintiff declined due

---

[2] Plaintiff initially treated with Dr. Moncrief in 2005 and 2006 where she underwent surgery for lumbar disk herniation at L5-S1 and lumbar radiculopathy. (Tr. 569-82).

to the "nerve pain" it caused. Dr. Neilson-Haak suggested an ultrasound of the tendons and noted, "The pain that she is having appears to be nervous." (*Id.*).

Dr. Lorenz completed a certificate to return to work on January 28, 2015, noting that plaintiff would need to extend her short-term disability until at least March because she needed her spinal cord stimulator adjusted and foot surgery. (Tr. 674).

In March 2015, plaintiff reported to the emergency department complaining of a right knee injury which occurred a couple of days prior. She had been diagnosed by an orthopedic specialist, Dr. Don Delcamp, M.D., with a ligamentous injury and was instructed to come to the emergency department for evaluation. (Tr. 1686). After x-rays and a physical examination, plaintiff was diagnosed with an acute right knee strain. (Tr. 1690). She followed up with Dr. Delcamp, who found mild swelling and tenderness. He noted that an MRI could not be performed due to plaintiff's spine stimulator implantation. (Tr. 738, 741). Dr. Delcamp provided a cortisone treatment for knee pain. (Tr. 741).

In April 2015, plaintiff elected to proceed with foot surgery with the understanding that Dr. Nielsen-Haak was unable to confirm tendon problems without an MRI. (Tr. 730-31). Dr. Nielsen-Haak performed surgery under the diagnoses of delayed healing of the fracture and flattening of the tendon. (Tr. 733). Dr. Lorenz prescribed plaintiff fentanyl patches during her recovery. (Tr. 879). Plaintiff saw Dr. Nielsen-Haak in May 2015 for surgery follow-up and reported she was feeling "really good" and had no foot pain. She did not wear her boot at home and had no pain. She wore her boot only if leaving the house for a long time. Plaintiff also reported that she had been bike riding. (Tr. 875). Upon examination, Dr. Nielsen-Haak found almost full muscle strength in her right foot and no pain with movement or palpation. (Tr. 877).

7

She assessed that plaintiff was doing very well, gave her range of motion and strengthening exercises, and suggested she return as needed. (*Id.*).

In May 2015, plaintiff consulted with orthopedic specialist Dr. Homayoun Mesghali, M.D., for right knee pain. She complained of pain when fully straightening her leg, squatting, or walking extended distances. (Tr. 815-17). An x-ray showed minimal early joint space narrowing and suspected torn cartilage. On June 3, 2015, plaintiff underwent video arthroscopy partial meniscectomy, patellofemoral lateral retinacular, arthroscopic lateral release surgery due to internal derangement of the right knee. (Tr. 813-14).

When seen on June 9, 2015, plaintiff reported that she apparently fell asleep and injured her knee and started having some pain mostly on the lateral side of the right knee. She stated that she was getting better and not taking much pain medication. On examination, Dr. Mesghali found swelling and tenderness. Dr. Mesghali assessed a sprain, gave plaintiff a steroid injection, and recommended physical therapy. (Tr. 847).

Plaintiff was seen by Dr. Nielsen-Haak on June 15, 2015 for a 9-week post-operative visit. Plaintiff reported that she had no pain in her foot and no limitations, but the foot felt a bit stiff. Plaintiff also reported that her symptoms were improved compared to pre-operative. Plaintiff was 100% weight bearing and had shown improvement in her activity level. (Tr. 879). Dr. Nielsen-Haak assessed that plaintiff was doing "very well" and suggested physical therapy for strengthening of her muscles. (Tr. 881).

When seen by a physician's assistant in Dr. Mesghali's office on July 1, 2015, plaintiff reported she was doing well and having "minimal discomfort." Plaintiff had full range of motion

and minimal tenderness in her knee. Plaintiff was to continue wearing her patellar stabilizing brace and perform strengthening exercises. (Tr. 1216).

Plaintiff underwent gastric bypass surgery in August 2015. At that time, she was 5 foot 2 inches tall, 192 pounds with a body mass index (BMI) of 35, and considered morbidly obese with comorbid conditions. (Tr. 2146-51).

On October 23, 2015, Dr. Lorenz prepared a narrative in which she stated that plaintiff was recovering from surgery with two more scheduled surgeries in the near future. Dr. Lorenz assessed that plaintiff would be unable to work until recovering from the future surgeries with dates to be determined. (Tr. 2382).

In February 2016, plaintiff consulted with neurosurgeon Dr. Juan Torres-Reverton, M.D. She indicated that since her gastric bypass and 88-pound weight loss, she experienced discomfort with her spinal stimulator and asked for it to be removed. (Tr. 1049). Plaintiff reported that she had not used the system for some time, and she had not experienced severe back pain since losing weight. (*Id.*). Dr. Torres explained that he could try to change the location of the battery to ease the discomfort, but plaintiff said she did not want to keep the stimulator. The stimulator was removed that month. (Tr. 1047-1051). When seen for surgical follow-up in May 2016, plaintiff reported no problems related to the removal surgery. (Tr. 1051).

Plaintiff was assessed for physical therapy on April 14, 2016. The physical therapist found tenderness and decreased range of motion of the back and decreased leg strength. Plaintiff's goals were to resume normal activities and increase strength and mobility. (Tr. 1877-78). Plaintiff attended three aquatic physical therapy sessions. (Tr. 1908-18, 1937-44).

9

Shortly after her initial physical therapy assessment, plaintiff again saw Dr. Mesghali about right knee pain. Dr. Mesghali found full range of motion and an otherwise normal examination. (Tr. 1219). Dr. Mesghali obtained x-rays and stated there was no evidence of a fracture, dislocation, or arthritis, and he provided plaintiff steroid injections and a knee brace. (Tr. 1220).

Plaintiff saw Dr. Lorenz for a check-up in April 2016. (Tr. 1257-61). When discussing her history, Dr. Lorenz reported that plaintiff's fentanyl and oxycodone prescriptions had been lowered so she could go back to work. Dr. Lorenz's notes include the statement, "Dr. Torres does not think she will be able to go back to work with the extent of her back surgeries and her restrictions." (Tr. 1259).

Plaintiff followed up with Dr. Mesghali in June 2016, complaining that "her right knee is still hurting quite a bit and she is having right anterior leg pain." (Tr. 1222). She recently underwent MRI's of her right knee and tibia which showed edema consistent with a stress injury. (Tr. 1224-25). Dr. Mesghali assessed plaintiff with a right knee "stress reaction" and bursitis. (*Id.*). He gave plaintiff a steroid injection and recommended anti-inflammatory medication. (Tr. 1225).

Plaintiff saw Dr. Lorenz for a recheck in June 2016. (Tr. 1248). She reported to Dr. Lorenz that she was "working on getting disability," and she could not stand more than one half-hour or sit more than one hour at a time. She also reported that she is not allowed to go back to water physical therapy until after "tummy tuck surgery" and recovery. (Tr. 1250). On examination, Dr. Lorenz noted plaintiff showed no signs of muscular atrophy, she had a stable gait, and she was wearing a right knee brace. (*Id.*).

In January 2017, an MRI of plaintiff's lumbar spine revealed significant degenerative disc disease at L5-S1 with collapse and inflammatory changes, lateral recess stenosis and epidural fibrosis, and foraminal stenosis correlating with radiculopathy. (Tr. 2340-42). An MRI of the cervical spine showed some degenerative disc disease. (Tr. 2347). Orthopedic surgeon Dr. Richard Gorman, D.O., examined plaintiff in February 2017. Plaintiff had good range of motion, almost full strength in her arms and legs, normal sensory and reflex exams, and a normal gait. (Tr. 2346-47). After reviewing the MRIs, Dr. Gorman recommended lumbar fusion surgery. (Tr. 2342-43). Dr. Gorman performed the lumbar fusion in April 2017. (Tr. 2360-64).

On May 8, 2017, one month after plaintiff's lumbar fusion surgery, Dr. Gorman assessed she was "doing well." Plaintiff exhibited good range of motion and ambulated well without assistance. (Tr. 2374-79). At that point, her preoperative pain was improved but she continued to have significant cervical pain. Dr. Gorman referred her to pain management. (Tr. 2374). X-rays showed a "stable" post-operative lumbar spine with minimal degenerative changes. (Tr. 2381, 2411).

Plaintiff saw Dr. Lorenz the following day on May 9, 2017, for a medication refill appointment. Plaintiff reported she had some trouble getting her oxycodone prescription recently and noted that the pain management doctor at the hospital increased her dosing from every 4 hours to every 3 hours. (Tr. 2384-86). On examination, plaintiff had no atrophy and a stable gait. Dr. Lorenz prescribed oxycodone and gabapentin. (Tr. 2387). That same day, Dr. Lorenz prepared a letter stating that plaintiff had been "unable to work in any fashion for the past 2 or more years. Please provide any monetary or other benefits available for her until her condition improves." (Tr. 2383).

11

Dr. Gorman referred plaintiff to pain management physician Daniel Benton Verrill, M.D., for her cervical degenerative disc disease. (Tr. 2399). In May 2017, Dr. Verrill reported that plaintiff's pain was consistent with cervical degenerative disc disease and associated cervical radiculopathy. (Tr. 2399). On examination, Dr. Verrill found tenderness in the upper back, full but slow range of motion of the cervical spine, and normal gait. (Tr. 2404-05). Dr. Verrill assessed mild discogenic disease with some uncinate and facet arthritic changes, most significant at C5-6 (Tr. 2405) and treated plaintiff with a cervical epidural steroid injection for pain. (Tr. 2415).

### E. Specific Errors

Plaintiff raises three claims of error: (1) the ALJ erred when she gave great weight to the opinions of the state agency physicians, who did not review all of the medical evidence in this case; (2) the ALJ erred by interpreting the raw medical data and medical evidence in formulating plaintiff's RFC; and (3) the ALJ erred by misinterpreting or mischaracterizing some of the evidence.[3]

### 1. Weight to state agency physicians

State agency reviewing physicians Dr. Anne Prosperi, D.O., and Dr. Gerald Klyop, M.D., reviewed the record in February and August 2015, respectively. Drs. Prosperi and Klyop opined that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 100, 119). They also determined that plaintiff would be limited to occasional foot

---

[3] Plaintiff's recitation of the medical evidence and her assignments of error address solely her physical, and not mental, impairments. (Docs. 11, 14). Therefore, the Court does not address plaintiff's mental impairments in this Report and Recommendation.

controls with her right lower extremities and should never climb ladders, ropes or scaffolds. (Tr. 100, 120). They stated that plaintiff could frequently balance and kneel but only occasionally climb ramps or stairs, stoop, crouch or crawl. (*Id.*). They also found plaintiff partially credible, noting that plaintiff reported not being able to lift more than five pounds or walk more than twenty minutes, but this level of severity was not fully supported by the objective medical findings. (Tr. 99, 118).[4]

Plaintiff contends the ALJ erred when she gave "great weight" to the opinions of the state agency physicians. Plaintiff alleges that their opinions fail to account for hundreds of pages of medical evidence that was entered into the record after they rendered their opinions, including additional surgeries, MRI and x-ray evidence, treatment notes, and opinions from treating sources. Plaintiff asserts that under these circumstances, the ALJ's decision giving "great weight" to the opinions of Drs. Prosperi and Klyop is not supported by substantial evidence.

When warranted, the opinions of agency medical and psychological consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Gayheart*, 710 F.3d at 379-80 (citing SSR 96-6p, 1996 WL 374180, at *3). *See also Wisecup v. Astrue*, No. 3:10-cv-325, 2011 WL 3353870, at *7 (S.D. Ohio July 15, 2011) (Report and Recommendation), *adopted*, 2011 WL 3360042 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency

---

[4] Plaintiff alleges the state agency physicians limited plaintiff "to what they termed sedentary exertion work." (Doc. 11 at 6, citing Tr. 104, 124). This is incorrect. The term "sedentary" appears in the "Assessment of Vocational Factors" portion of the state agency's review at the initial and reconsideration levels, which is undertaken by both a disability adjudicator/examiner and an agency physician or psychologist. The form asks, "Based on the seven strength factors of the physical RFC . . ., the individual demonstrates the maximum sustained work capability for the following:". The word "SEDENTARY" is written as the response. (Tr. 104, 124). There is no evidence that the state agency physicians were involved in the vocational portion of the disability assessment. In any event, the specific function by function limitations assessed by the state agency physicians were clearly for "light" work (Tr. 99-101, 119-120), which is what the ALJ relied on in fashioning plaintiff's ultimate RFC. This isolated reference to "sedentary" work had no bearing on the ALJ's decision in this case.

medical consultants have some value and can, under some circumstances, be given significant weight"). The opinions of reviewing sources "can be given weight only insofar as they are supported by evidence in the case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (citing SSR 96-6p, 1996 WL 374180, at *2 (1996)). However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" in order for the opinion of the non-treating source to be entitled to greater weight than the opinion of a treating source. *Id.* The Sixth Circuit has explained:

> There will always be a gap between the time the agency experts review the record . . . and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give "'some indication' that he 'at least considered' that the source did not review the entire record. . . . In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (construing *Blakley*, 581 F.3d at 409).

Before she weighed the medical opinions of record, the ALJ thoroughly reviewed the medical evidence both pre- and post-dating the opinions of Drs. Prosperi and Klyop. (Tr. 24-28). The ALJ considered the evidence of plaintiff's successful gastric bypass surgery in August 2015, resulting in pain minimization and increased functional abilities. (Tr. 25, 2321). Clinic notes from August 2016 state that plaintiff had lost 100 pounds following her surgery. She had good

14

range of motion in all joints, retained normal motor and sensory function, and had no tenderness to palpation of the back. (Tr. 25, 2323-34).

The ALJ also discussed plaintiff's right knee impairment, for which she underwent arthroscopic surgery in June 2015. One month post-surgery, plaintiff was doing well and had minimal discomfort. (Tr. 25, 1216). On examination, she had swelling but full range of motion and minimal tenderness. (*Id.*). In April 2016, plaintiff had full range of motion of the knee and an otherwise normal exam. (Tr. 25, 1218). X-rays showed no evidence of a fracture, dislocation, or arthritis, and Dr. Mesghali gave plaintiff steroid injections for pain and prescribed quadricep exercises. (Tr. 1220). When seen in June 2016 for her complaints of right knee pain, examination revealed full range of motion of the knee, no effusion, stable varus and valgus stress test, and some pain and tenderness. (Tr. 1222). An MRI of the right knee was grossly normal with a small right knee joint effusion and no evidence of internal derangement. (Tr. 25, 1225).

The ALJ also considered plaintiff's successful surgical treatment in April 2015 for a right foot fracture and tendon repair. (Tr. 25, 862). On a follow-up visit one month post-surgery, plaintiff reported she was feeling "really good" and had no foot pain. (Tr. 875). Plaintiff was assessed as doing very well, she was given range of motion and strengthening exercises, and she was to return as needed. (*Id.*). One year later in April 2016, plaintiff was full weight-bearing and using no assistive devices. (Tr. 25, 1878). In August 2016, she exhibited good range of motion in all joints and no tenderness. (Tr. 25, 2323). Her gait was stable. (Tr. 25, 2386, 2391, 2396).

The ALJ further discussed plaintiff's lumbar fusion surgery in April 2017. (Tr. 24, 2360-64). In May 2017, plaintiff reported some pain in the left gluteal region but otherwise she was

15

doing well. (Tr. 24, 2374). On physical examination, plaintiff had good range of motion of her musculoskeletal system and ambulated well without assistance. (Tr. 24, 2379). X-rays showed a stable post-operative lumbar spine. (Tr. 24, 2408). That same month, plaintiff was examined by Dr. Verrill for pain management for cervical radiculopathy. (Tr. 24, 2404). An MRI of the cervical spine revealed mild discogenic disease. (Tr. 2405).

The ALJ considered the evidence submitted after the state agency doctors gave their opinions and assessed those opinions in light of the subsequent evidence. The ALJ stated, "[O]verall, the subsequent evidence did not evince a substantial worsening of any of her conditions and in some cases, her conditions improved. Thus, the range of light and unskilled residual functional capacity as set forth above is well supported by the consultant's opinions." (Tr. 28). The ALJ gave great weight to the opinions of the state agency physicians, stating that she adopted the range of light work activities they recommended but "added a sit/stand option, manipulative, and environmental limitations due to plaintiff's ongoing back pain plus from the findings of hand problems, and the claimant's testimony about medication side effects." (*Id.*).

The Court finds no error in the ALJ's weighing of the state agency physicians' opinions. The ALJ explicitly considered the evidence submitted subsequent to Drs. Prosperi and Klyop's April and August 2015 opinions and explained why she believed additional restrictions were warranted. (Tr. 24). The ALJ fulfilled her duty to give "some indication that [s]he at least considered that the [non-examining] source did not review the entire record" and "subjected such an opinion to scrutiny." *Kepke*, 636 F. App'x at 632. The ALJ noted that the opinions of Drs. Prosperi and Klyop were generally supported by the record but acknowledged that the other record evidence showed plaintiff was further limited in her physical functional ability. (Doc.

28). As a result, the ALJ imposed greater restrictions on plaintiff's physical RFC than those imposed by the state agency doctors. Plaintiff has not cited any evidence that calls the ALJ's finding into question. Plaintiff has failed to show any error in this regard. Accordingly, plaintiff's first assignment of error should be overruled.

## 2. Interpretation of "raw medical data"

Plaintiff also argues the ALJ erred by interpreting the "raw medical data" and medical evidence submitted after the state agency reviewing physicians rendered their opinions. Plaintiff alleges there was no physician who reviewed this evidence, and therefore the ALJ took on the task of interpreting the records of plaintiff's multiple surgeries, raw medical data like x-rays and MRIs, treatment notes, and treating source statements. Plaintiff contends the ALJ is not qualified to interpret this substantial medical data and evidence in functional terms. (Doc. 11 at 6, citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 914-915 (N.D. Ohio 2008) (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)); *Smiley v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 592, 600-601 (S.D. Ohio 2013) (citations omitted); *Mitsoff v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 693, 702 (S.D. Ohio 2013)).[5] Plaintiff asserts "the ALJ is not permitted to substitute her lay interpretation of the medical data for that of the treating medical doctors—who opined that [plaintiff] was unable to work." (*Id*. at 8-9).

It is well-settled that "the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [the claimant's] residual

_____

[5] The cases cited by plaintiff have been criticized and appear to be inconsistent with subsequent Sixth Circuit case law. *See Edwards v. Comm'r of Soc. Sec.*, No. 1:17-cv-925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4, 2018) (and cases cited therein).

functional capacity." *Coldiron v. Comm'r of Soc. Sec.,* 391 F. App'x 435, 439 (6th Cir. 2010)

(internal citations and quotations omitted) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629,

633 (6th Cir. 2004)). "An ALJ does not improperly assume the role of a medical expert by

weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron,*

391 F. App'x at 439 (citing *Poe v. Comm'r of Soc. Sec.,* 342 F. App'x 149, 157 (6th Cir. 2009);

*Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001)). *See also* 20 C.F.R. § 416.946(c)

(the ALJ is responsible for assessing a residual functional capacity). As the Sixth Circuit

recently explained:

> [The plaintiff] also argues that the ALJ's RFC lacks substantial evidence because
> no physician opined that [the plaintiff] was capable of light work. But "the *ALJ* is
> charged with the responsibility of determining the RFC based on her evaluation of
> the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.,* 531 F.
> App'x 719, 728 (6th Cir. 2013) (emphasis added). An RFC is an "administrative
> finding," and the final responsibility for determining an individual's RFC is
> reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at *1-2 (July 2,
> 1996). "[T]o require the ALJ to base her RFC on a physician's opinion, would, in
> effect, confer upon the treating source the authority to make the determination or
> decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at
> 728.

*Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017); *see also Mokbel-*

*Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously

rejected the argument that a residual functional capacity determination cannot be supported by

substantial evidence unless a physician offers an opinion consistent with that of the ALJ.").

Here, the ALJ did not impermissibly craft an RFC by evaluating "raw medical data."

None of the evidence submitted after the initial and reconsideration stages required the ALJ to

interpret medical data beyond her ability. *See Rudd*, 531 F. App'x at 726-27 (ALJ did not

impermissibly act as a medical expert in interpreting medical evidence, and did not interpret raw medical data beyond her ability, where x-rays had already been read and interpreted by a radiologist). Plaintiff's own doctors read and interpreted the x-ray and MRI evidence, and they reported in plain language statements about plaintiff's subjective complaints, her objective condition, plaintiff's progress following her surgeries, and their assessments and recommendations for treatment. This evidence did not require the ALJ to interpret raw medical data but rather to evaluate it for consistency with the state agency doctors' opinions and the other record evidence. The ALJ properly evaluated the specific opinions of Drs. Prosperi and Klyop, the subsequent medical evidence entered into the record, and plaintiff's testimony in crafting an RFC finding.

In addition, and contrary to plaintiff's argument, the ALJ did not "substitute her lay interpretation of the medical data for that of the treating medical doctors" who opined that plaintiff could not work. Dr. Torres stated in April 2016 that he did not think plaintiff would "be able to go back to work with the extent of her back surgeries and her restrictions." (Tr. 1259). In October 2015, Dr. Lorenz prepared a narrative that stated plaintiff was recovering from surgery with two more scheduled surgeries in the near future and "she is therefore unable to work in any capacity until she recovers from the upcoming surgeries," the dates of which were yet to be determined. (Tr. 2382). In May 2017, Dr. Lorenz prepared a letter stating that plaintiff had been "unable to work in any fashion for the past 2 or more years. Please provide any monetary or other benefits available for her until her condition improves." (Tr. 2383).

As the ALJ reasonably determined, these statements by plaintiff's doctors were entitled to little weight because they were conclusory and failed to provide any justification for the

conclusion that plaintiff could not work. (Tr. 29). The ALJ stated that such opinions were inconsistent with the objective medical evidence and physical exam findings showing normal gait, normal strength in the extremities, no atrophy, and normal range of motion in the extremities. (*Id.*). Moreover, neither Dr. Torres nor Dr. Lorenz gave any specific functional limitations in their opinions. The opinion that plaintiff is "unable to work" is an opinion regarding whether plaintiff is disabled, which is an issue reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(1),(3) (opinion that a person is "disabled" or "unable to work" is an issue reserved to the Commissioner, and a physician's opinion that his patient is disabled will not be given "any special significance"). The ALJ committed no error in this regard, and plaintiff's second assignment of error should be overruled.

### 3. Mischaracterization of evidence

Finally, plaintiff contends the ALJ erred by misinterpreting or mischaracterizing the evidence following plaintiff's April 2017 back surgery by rejecting the opinions of Dr. Torres and Dr. Lorenz because plaintiff allegedly reported her "preoperative symptoms had been relieved." (Doc. 11 at 8, citing Tr. 24, 29). Plaintiff states the treatment records cited by the ALJ actually document pain consistent with cervical degenerative disc disease and associated cervical radiculopathy in the neck, head, shoulder, and elbows. (Doc. 11 at 8, citing Tr. 2399-2400).

The ALJ did not mischaracterize the evidence. Plaintiff's back fusion surgery was performed at the L5-S1 level and not in her cervical spine, and her pre-operative low back pain was improved the month following her surgery as the ALJ accurately noted. (Tr. 2374). In any

20

event, as explained above, the opinions given by Drs. Torres and Lorenz that plaintiff was unable to work were on issues reserved for the Commissioner and were not entitled to any deference.

Plaintiff also takes issue with the ALJ's statement that plaintiff's "activity level included the ability to bike or walk 1 mile (16F/2)." (Doc. 11 at 8, citing Tr. 24). Plaintiff states that the exhibit cited by the ALJ does not reflect plaintiff's activity level but plaintiff's surgery for internal derangement of the right knee. (*Id.*, citing Tr. 813).

This is clearly a typographical error on the ALJ's part. As the ALJ noted elsewhere in her decision, plaintiff did report increased activity levels including bike riding and the ability to walk one mile. (Tr. 24, 945; Tr. 25, 1082). The misstatement by the ALJ is harmless error. Plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 8/20/19

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARY M. EVANS,                                        Case No. 1:18-cv-632
    Plaintiff,                                       Black, J.
                                                      Litkovitz, M.J.

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

    Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).